[Civ. No. 4958.   Fourth Dist.   Mar. 9, 1956.]

WAYNE T. STEWART, Appellant, v. JOHN MARVIN, Respondent.

770

Deadrich, Gill & Bates, Deadrich, Bates & Stewart and John H. Stewart for Appellant.

Woodruff & Williams for Respondent.

GRIFFIN, J.—Plaintiff brought this action against defendant to partition certain property in Kern County. Defendant answered and by way of cross-complaint sought a declaration that plaintiff held the property as constructive trustee for defendant because a former deed to the property was obtained by fraud and undue influence.

The facts show that defendant, in 1933, then aged 62, was married to Anastasia Marvin, then aged 42; that in 1948, they were divorced and a property settlement agreement was entered into whereby defendant, by deed, became the sole owner of their home as his separate property. Anastasia acquired certain other properties, and thereafter she apparently believed she should have had a better settlement. After the divorce was granted it appears that Anastasia moved to set aside the interlocutory decree. The motion was denied. One month later, after overtures made to John about a reconciliation and a different property settlement, Anastasia, unaided by counsel, on June 15, 1949, took John to the judge and they there consented to set aside the interlocutory decree, and they resumed matrimonial relationship. Apparently Anastasia then began to "nag" John about transferring the home property to her. It appears that in the meantime John had transferred an interest in the property to his children by a former marriage. When Anastasia found this out she went to see her lawyer and endeavored to ascertain how the children could be made to return the property to their father. After some endeavor deeds were secured deeding the property back to defendant. It then appears that Anastasia set out to obtain an interest in it. She "nagged" John, who was then 79 years old and somewhat senile, until he consented to go with her to a notary public, not her lawyer, and on June 27, 1951, had him sign a joint tenancy deed of the property to the two of them. John testified he did it because he had a deep love and regard for the woman, implicit confidence in her, and "in order to make her happy"; that he did it because of her persistent nagging and threats that she was going to leave him again; that she was constantly after him to sign the deed, and he did so in order to have a little peace; that he wanted to provide in it that both could live in the house as long as they lived, and then the property was to go to his children; that he believed this was being accomplished by the making of the joint tenancy deed.

It appears that Anastasia was instrumental in having mutual wills drawn by them in November, 1950, whereby

each left his or her property to the other in case one predeceased the other, and after their death the property was to go to the three children of John. It also appears that after obtaining the joint tenancy deed Anastasia, unbeknown to John, went to her attorney and executed another will leaving her property to strangers to John; that in February, 1952, while they were living in the house and just before her death, unbeknown to John, she made a gift deed of her joint tenancy interest in the home place to plaintiff, her nephew. It was not until after her death that John found she had made a different will and had deeded the one-half interest in the home property to plaintiff.

The trial court found generally in accordance with these facts; that at the time of the execution of the joint tenancy deed on June 27, 1951, the parties were husband and wife, and that a confidential relationship existed between them; that John did not have independent advice and did not apprehend the results of his acts; that he was "affected to a substantial extent by senility and was not in complete control of his mental faculties"; that John intended that his wife should have and enjoy the property only in the event she should survive him; that prior to said deed she persistently and constantly nagged and demanded of him that he execute the deed in question to her; that he was so senile and his mental faculties sufficiently impaired as to make effective such nagging and demanding, and by reason thereof, and the trust and confidence reposed in her, she succeeded in procuring the execution of said deed with intent to defeat defendant's intent above stated; and that the deed was procured by undue influence exerted on John Marvin by Anastasia Marvin.

It then held that plaintiff take nothing by his complaint and that he be ordered to reconvey to defendant any claimed interest he might have therein.

The main contention on this appeal is that the evidence is insufficient to support the finding of undue influence. In addition to what has been stated, the testimony of defendant is that he was 81 years of age on February 5th, 1954, at the time of trial; that the joint tenancy deed had been prepared in advance and was awaiting his signature when his wife took him to the notary's office; that he did not know at that time that she could subsequently legally deed her joint tenancy interest in the property to another without his consent; that he always went to his lawyer about legal affairs but unfor-

tunately he did not do so on this occasion because she took him to a notary public. He testified on cross-examination that he was in good health and there was nothing wrong with his mind on June 27, 1951, "any more than there is today." The general course of cross-examination, as reflected by the record, clearly indicates that the trial court's finding that defendant was affected to a substantial extent by senility and was not in complete control of his mental faculties, has some evidentiary support. The trial judge made an observation of defendant on the witness stand and had an opportunity to judge his mental condition at the time of trial. (*Payne* v. *Payne*, 12 Cal.App. 251, 253 [107 P. 148].) From an examination of the record of his testimony it must have been obvious to all the parties present at that hearing that there was considerable indication of senility of the defendant.

Mr. Woodruff, who had been defendant's attorney since 1941, testified defendant came to him with all his legal problems but did not consult him about the joint tenancy deed here indicated; that he represented him in the divorce action and property settlement agreement; that Anastasia left defendant in 1947, and withdrew a good portion of their joint bank account; that she went to Texas and defendant filed a suit to attach and impound the funds; that defendant was then recovering from a very serious heart attack and that in 1947 he suffered a stroke and was in the hospital and unconscious for about 1½ months; that he then advised defendant to execute a deed of the home property which was in joint tenancy with Anastasia, to him, his attorney, who, in turn, executed deeds of the one half interest to his three children. Subsequently, as a result of the property settlement agreement, Anastasia deeded her one-half interest in the property to defendant. Woodruff testified that he drew their respective wills, after the reconciliation; that they each stated they wanted the property to go to the other in case of one's death, and then to the three children of defendant; that these wills were left with him; that in the fall of 1951, when he was successful in obtaining the deeds from the three children, Anastasia demanded her will from him and he gave it to her; that he did not know that she had drawn a different will until after her death; and that Anastasia never contacted him again about any legal matter. There is some testimony of this witness that after defendant's heart attack, he "more or less" recovered from it and was physically about in the same condition as he was at the trial of trial.

The notary who drew the joint tenancy deed here involved testified that although he did not know defendant before, from his appearance on that day, he did not notice anything about him that would indicate he was not in full possession of all his physical and mental faculties, or that he was under the influence or domination of any other person, and that his memory was refreshed only by the notation of the transaction in his record.

It is argued that from this evidence it does not show any undue influence, *at the time of the execution of the deed,* which would bring this case within the rules laid down in *Carleton* v. *Bonham,* 60 Cal.App. 725, 739 [214 P. 503]; *Kelly* v. *McCarthy,* 6 Cal.2d 347, 364 [57 P.2d 118]; and *Goodwin* v. *Goodwin,* 59 Cal. 560, 561, to the effect that in order to substantiate such findings as those made by the court, it was obligatory upon respondent to prove that the grantee made false representations as to a material fact, or exercised pressure which overpowered the mind and bore down the volition of the donor at the very time the deed was made, and to show that not only had undue influence been exercised but also that it had produced an effect upon the mind of the grantor by which the deed he executed was not the expression of his own desires.

Counsel for plaintiff contends that the trial court relied solely upon a presumption of undue influence arising out of the husband and wife relationship in reaching its conclusion. The findings do not so indicate. In *Brison* v. *Brison,* 90 Cal. 323 [27 P. 186], it was held that the influence which the law presumes to have been exercised by one spouse over the other is not an influence caused by any act of persuasion or importunity, but is that which is superinduced by the relation between them, and generated in the mind of the one by the confiding trust he has in the devotion and fidelity of the other. Such influence the law presumes to have been undue, whenever this confidence is subsequently violated or abused. (*Tillaux* v. *Tillaux,* 115 Cal. 663 [47 P. 691].) See also *Buchmayer* v. *Buchmayer,* 68 Cal.App.2d 462 [157 P.2d 9], where it is said, at page 467: "While it is to be assumed, in the absence of evidence to the contrary, that the husband and wife reposed confidence in each other, that fact alone does not raise a presumption against the validity of their dealings with each other. . . ." The court there held that there was no evidence to support the finding of undue influence independent of the presumption, and said that a finding of the use

of undue influence would have been unwarranted without proof independent of the presumption of the exertion of influence at the time the deed was executed, and there was no such proof.

As to what constitutes undue influence and what constitutes sufficient proof thereof, as defined in Civil Code, section 1575, it has been said, depends upon the facts and circumstances of each particular case. It is a species of constructive fraud which the courts will not undertake to define by any fixed principles, lest the very definition itself furnish a fingerboard pointing out the path by which it may be evaded; that where a grantor has trust and confidence in the integrity and fidelity of the grantee and the latter takes advantage of the grantor relief will be afforded. (*Sparks* v. *Sparks*, 101 Cal.App.2d 129, 135 [225 P.2d 238].) The fact that the parties stand in such a position toward one another, either by reason of relationship, professional employment, or otherwise, that the grantor is peculiarly susceptible to exertion of influence by the grantee, is a consideration of primary importance in this connection, in cases where the transaction is in itself improvident or disadvantageous to the grantor. And the fact that the grantor is lacking in such mental vigor as to enable him to protect himself against imposition is a reason for the interposition of equity to protect him, although the mental weakness is not such as to justify him in being regarded as totally incapacitated. The law makes a clear distinction between the proof of the existence of undue influence necessary to set aside a will and that which is required to cancel a deed of gift or conveyance *inter vivos*.

It is said in *Longmire* v. *Kruger*, 80 Cal.App. 230, 238 [251 P. 692], that no presumption of undue influence is indulged in upon the contest of a will, unless confidential relations are first established. But with respect to gifts or conveyances *inter vivos*, the extreme age and infirmity of the grantor, together with slight evidence of circumstances from which it may be inferred that the instrument was the product of coercion, will suffice to shift the burden and require the beneficiary to show affirmatively that the transaction was fair and free from influence.

Applying these principles, it appears that defendant was possessed of the property as his separate property and the parties were reconciled at the wife's instigation. He consented because he said he "loved and trusted" her and had "implicit confidence in her." He wanted to see that she had a

place in which to live in case he predeceased her. They had mutual wills so providing, which also provided that upon their deaths the property was to go to his children, since she had no children of her own. The evidence shows a preconceived plan to influence defendant to later have the property placed in joint tenancy, notwithstanding their mutual agreement set forth in the wills, whereby she could break the joint tenancy and otherwise dispose of a one-half interest in the property, leaving her nephew holding the home with defendant as tenants in common.

Although there is some evidence to the contrary, defendant stated he did not realize that Anastasia could defeat the purpose of their understanding and their wills by secretly deeding her interest in the joint tenancy to her nephew.

The evidence above related, when considered in conjunction with the evidence of defendant's mental condition, justified the court's finding that this joint tenancy deed was a product of coercion, and that Anastasia took unfair advantage of such weakness of mind and of his distress by coercing him into signing the joint tenancy deed involved. (*Seeberg* v. *Seeberg,* 9 Cal.App.2d 450 [50 P.2d 450].)

The next claim is that the court erred in admitting into evidence the mutual wills of the parties. Apparently the court found that there was a preconceived plan of Anastasia to defeat the intent of defendant that his property should only go to her in case she survived him. The terms of these wills were important in determining this question and were accordingly admissible.

Lastly, it is argued that the court erred in allowing certain leading and suggestive questions to be propounded to the defendant while on the witness stand. From the nature of the answers and the questions propounded it clearly shows that the court and respective counsel were faced with considerable difficulty in an endeavor to elicit responsive answers to the questions. Defendant was 81 years of age and lacking in memory, and it was evident he had difficulty in grasping the meaning of the questions. There was no curtailment of the right of cross-examination. The interests of justice required that certain latitude be allowed in questioning defendant in order to bring out his evidence in the best manner possible. (27 Cal.Jur. p. 80, § 62.) No abuse of discretion appears. (*Mead* v. *Mead,* 41 Cal.App. 280, 284 [182 P. 761].)

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.